990 So.2d 1199 (2008)
Benjamin SMITH, Appellant,
v.
STATE of Florida, Appellee.
No. 5D08-1715.
District Court of Appeal of Florida, Fifth District.
September 19, 2008.
*1200 Joseph C. Bodiford of Bodiford Law, P.A., Tampa, for Appellant.
Bill McCollum, Attorney General, Tallahassee, and Anthony J. Golden, Assistant Attorney General, Daytona Beach, for Appellee.
EVANDER, J.
Smith appeals the summary denial of his amended second Rule 3.850[1] motion for post-conviction relief. In May 2000, Smith was convicted, after a jury trial, of first degree murder, attempted first degree murder, and attempted burglary of a vehicle. His conviction was per curiam affirmed and this court issued its mandate on June 1, 2001. See Smith v. State, 787 So.2d 874 (Fla. 5th DCA 2001). Smith filed his first Rule 3.850 motion on May 1, 2003, which was summarily denied by the trial court. This court affirmed. See Smith v. State, 894 So.2d 263 (Fla. 5th DCA 2005). However, we find that the trial court erred in summarily denying Smith's amended second motion for post-conviction relief. This motion was based on new evidence provided in the post-trial sworn statement of Mazie Jackson n/k/a Pauldo (Pauldo).
On February 3, 1996, at approximately 10:30 p.m., the victims, Ellis Tapley and Kenneth Dozier, and several of their friends and family members attended a monster truck rally at the Citrus Bowl in Orlando. As they were returning to their vehicles, one of the friends, Terry Manley, spotted a young black male trying to break into Dozier's Ford Explorer. Manley ran ahead to the Explorer causing the would-be burglar to flee. Manley, Dozier, Tapley and another friend, Lee Keith, began to chase the suspect. During the chase, the suspect shot Tapley and Dozier. Tapley died at the scene, while Dozier was paralyzed from the chest down as a result of the shooting. A motorcycle police officer joined in the chase and exchanged gunshots with the fleeing suspect. However, the suspect was able to escape into a nearby neighborhood. The police officer was never close enough to the suspect to identify him.
Ms. Pauldo was the only witness to the shooting of Tapley. She was parked at the side of the roadway to pick up her child who had been taken to the rally by a relative. She heard a commotion and, although it was dark, observed several men chasing a black male. She heard a gunshot and then saw the black male shoot Tapley. She testified at trial that she was able to see the suspect "squarely in the face" before he escaped. She then went to render aid to Tapley. Subsequently she provided a general description of the suspect to police from which a sketch was generated. Pauldo's description to police was that the suspect was approximately 5' 11", 16-17 years old, with "very dark knuckles," and short, cropped hair. Two and one-half years later, the defendant, Benjamin Smith, was placed in a line-up. Pauldo, Keith, Manley and Tommy Whitmer were among those given the opportunity to view the line-up. (Dozier had previously stated that he never saw the suspect's face.) Manley was unable to identify the defendant. Keith identified Smith but stated that although he was "ninety-eight percent" sure in his identification, he could not be positive. The two unequivocal positive identifications of Smith were made by Pauldo and Whitmer. Whitmer was the deceased Tapley's younger brother. He was ten years old at the time of the shooting. He did not tell anyone that he *1201 had been able to see the suspect until two years after the incident. As a result of this "belated" statement, he was brought to the line-up.
After the line-up, Smith was arrested and charged with first degree murder, attempted first degree murder, and attempted burglary of a vehicle. At trial, Keith and Whitmer identified Smith as the man being chased. On cross-examination, Keith was impeached by his statement to police on the night of the shootings regarding his lack of opportunity to see the suspect's face. Whitmer was impeached by his earlier statement to the police that he had been a block away from the suspect, not twenty feet as he stated at trial. Whitmer's line-up identification was bolstered by the testimony of the lead investigator, Detective Gause. Gause testified that Whitmer trembled and started to cry as he picked Smith out of the line-up.
Pauldo was also called by the State. She testified that she had selected Smith from a photo array and at the physical line-up. (The photo array identification occurred prior to the line-up.) However, she did not make an in-court identification. On cross-examination, she testified that Smith's knuckles were not dark as she had described the suspect's and that Smith's height was approximately 5' 7", not the 5' 11" to 6' as she had previously described the suspect. When asked by defense counsel "[T]hat's [referring to Smith] not the man you saw that night, is it?", Pauldo responded: "[H]e looks a little different now. I mean, he's not dark and his [sic] has more hair ... He's not the guy that he doesn't look the same from the picture or the line-up." On cross-examination, Pauldo also acknowledged that she had four prior felony convictions with the last conviction having occurred approximately ten years prior to the trial.
Smith presented the testimony of numerous witnesses, including himself. His primary defense was that the shootings had been committed by his cousin, Vincent Hubbard. Hubbard was a Georgia resident but was temporarily residing with Smith's family and attending Jones High School in Orlando. Smith's mother's residence was located in the area where the suspect "disappeared." Smith testified that on the evening in question, he was at his mother's home. He stated that he was on the telephone with his girlfriend, Tara Proctor, when he heard the gunshots. Shortly thereafter, Hubbard came into the residence. Hubbard went upstairs and changed his shirt. He then requested cleaning products from Smith and his mother. Smith gave him "some kind of cleaner" and Hubbard scrubbed his hands. Hubbard moved back to Georgia within a week of the shootings. Hubbard visited Smith's family a few months later. During this visit, Smith alleged that Hubbard confessed to the shootings. On cross-examination, Smith admitted that he had not advised the police of Hubbard's alleged confession. Smith also acknowledged that he had four prior felony convictions.
Smith's mother, Pauline Gibson, testified that Smith was in her house at the time they heard gunshots. Her testimony regarding Hubbard's entry into the house and request for cleaning products was consistent with her son's. After Smith was arrested, Smith and her daughter, Lorisa Gibson, went to Georgia to discuss the situation with Hubbard and Hubbard's father. It was her understanding that Hubbard was going to hire an attorney, return to Orlando, and turn himself in.
Smith's sister, Lorisa Gibson, testified that shortly after the shooting, Hubbard told her that he was responsible for the shootings. When she asked Hubbard what he was going to do, Hubbard stated that *1202 he would go back to Georgia and hire an attorney. Lorisa did not tell her mother about the conversation until after her brother was arrested. Her testimony regarding the trip that she made to Georgia with her mother to talk to Hubbard and Hubbard's father was consistent with the testimony of her mother. Lorisa called the crime hot line upon her return to Orlando to report Hubbard's confession.
Carl Patrick, the father of Lorisa Gibson's children, testified that he came to the house the day after the shooting and, although he did not speak with Hubbard, he noticed that Hubbard was acting nervous and "paranoid," and shaking. A few months later, Patrick saw Hubbard again at the defendant's mother's house. Patrick testified that, during this visit, Hubbard bragged about the shootings.
Smith's girlfriend, Tara Proctor, lived down the street. She testified that she was on the telephone with Smith when she heard the gunshots.
Defendant's step-father, Charles Gibson, testified that he was not at home at the time of the shooting. He further testified that Detective Gause showed him a sketch of the subject. He initially did not make any identification from the sketch. Shortly thereafter, he observed what he believed to be bullet damage to a back wall of the house. He called Detective Gause and police came and inspected the damage. A projectile was found on the ground about three feet from the damaged wall. Gibson later re-examined the sketch and then called to speak to Detective Gause. He did not reach Gause, but left a message that was never returned. He thereafter called the crime hot line concerning another person living in his house at the time of the shooting. (The trial court did not permit Gibson to tell the jury that the individual he referenced during his hot line call was Vincent Hubbard.)
When called by the defense, Detective Gause testified that he had received information from the Gibsons concerning Hubbard within weeks after the shootings. As a result, he had traveled to Georgia and interviewed Hubbard. Based on his interview with Hubbard and the fact that Hubbard did not match the description of the suspect previously given, Gause did not believe Hubbard was the individual who shot Tapley and Dozier. He acknowledged that Hubbard's photo was never included in any photo array nor was he ever placed in a line-up. Additionally, Gause testified that Hubbard was sixteen years old at the time of the shootings.
Hubbard testified and denied any involvement in the shootings. He stated that he was asleep in the Smith's residence when he was awakened by the gunshots. He denied ever admitting to Smith, Lorisa Gibson, or Carl Patrick that he was responsible for the crimes. He acknowledged that Mrs. Gibson and her daughter came to Georgia after Smith's arrest. However, he stated that they only spoke to his father and that he was not part of any conversation. Finally, Hubbard testified that he had returned to Georgia because he was doing poorly in school and his mother wanted him back. Hubbard is approximately 5' 4" tall.
In rebuttal, the State called a fingerprint examiner who testified that Hubbard's fingerprints did not match any fingerprints found at the crime scene. Mrs. Gibson was also called by the state to confirm that Hubbard's return to Georgia had already been planned prior to the shootings.
During their deliberations, the jurors asked for read-backs from the testimony of Hubbard and Whitmer. They later returned a verdict of guilty on all three charges.
*1203 After his unsuccessful appeal, Smith filed his first Rule 3.850 motion through his new counsel, Michael Giordano. This motion was filed on May 1, 2003. The State was ordered to respond on April 6, 2004, and filed its response on July 9, 2004. The initial motion was subsequently denied by order dated September 4, 2004. In April 2004 (subsequent to the filing of the initial Rule 3.850 motion, but prior to the trial court's ruling), Smith was advised by Rufus Shinn that Ms. Pauldo had information about the case which had not been presented at trial. Attorney Giordano then obtained a sworn statement from Pauldo on July 29, 2004. In her statement, Pauldo stated that Smith was not the individual who shot Tapley and Dozier. She further averred that a police officer who had previously arrested her on drug charges threatened to have her put in jail if she did not cooperate by identifying the suspect. She stated that police informed her employer that she was not cooperating and that she was then fired. Additionally, Pauldo claims she was promised crime stopper reward money if she identified Smith. (At trial, the defense had been prohibited from asking Pauldo whether she received, or expected to receive, reward money.) She said that the officer then brought her to Detective Gause who showed her a picture of Smith and wanted her to identify him as the shooter. Pauldo said she gave into the pressure and agreed that the person in the photograph was the shooter. Later on, immediately prior to the line-up, a detective again showed Pauldo a photograph of Smith and stated he did so "to keep [her] memory fresh." In her sworn statement, Pauldo also alleged that she had been told not to tell anyone that she had been shown Smith's photograph immediately prior to the line-up.
Prior to viewing the line-up, Pauldo stated that she was left in a room with other individuals who were to view the line-up. She stated that the first person summoned, returned and said "It's number six... pick number six." When the second person who viewed the line-up returned, he stated to the first individual, "you picked the wrong one, it's not six, it's four, it's four, pick four." After that, according to Pauldo's sworn statement, the next person picked number four. Pauldo stated that there were six people in the line-up. One was white, one was Hispanic, and three were individuals she knew to be police officers. The remaining individual, Smith, was "number four." Pauldo identified Smith.
Two years after the trial, Pauldo learned that Smith was the nephew of one of her acquaintances. Smith's aunt told Pauldo that Smith was innocent. Pauldo was later contacted by Rufus Shinn and eventually gave her sworn statement on July 29, 2004. Pauldo's statement was subsequently transcribed. The court reporter certified the transcript on September 2, 2004.
There is at least one other aspect of Pauldo's sworn statement that is noteworthy. Pauldo insisted that there was no ten-year-old boy present at the scene. This testimony is significant because Tommy Whitmer's positive identification of Smith at the pre-trial line-up and at trial was an important part of the State's case. Furthermore, one of the issues raised in Smith's initial Rule 3.850 motion was that trial counsel had been ineffective for not calling Krystal Miles as a witness. It was alleged that Miles would have testified that after Whitmer completed his trial testimony and had left the courtroom, he stated that he did not know who to pick out at the line-up until the detective raised four fingers.
For some unknown reason, Giordano did not seek to amend Smith's pending Rule 3.850 motion. (Given the time frames referenced *1204 above, it is possible that Giordano did not receive Pauldo's transcribed statement until after the trial court had ruled on Smith's initial Rule 3.850 motion.) Smith alleges that he was unable to contact Giordano after the trial court's denial of his initial motion and, as a result, had to file the notice of appeal pro se. Smith's allegation regarding the unavailability of Giordano finds some support from a Florida Supreme Court order dated July 7, 2005, accepting Giordano's disciplinary resignation from The Florida Bar. The order provided, inter alia, that Giordano's disciplinary resignation was "tantamount to disbarment."
After this court affirmed the summary denial of Smith's initial Rule 3.850 motion, Smith filed a second motion for post-conviction reliefrelying on the new evidence received from Pauldo. Smith then retained new counsel, who filed the instant amended motion for post-conviction relief on May 16, 2006. The State was ordered to respond on January 11, 2008, and filed a response on March 8, 2008.[2]
On March 27, 2008, the trial court summarily denied the amended motion for post-conviction relief. The trial court found that Smith's claims were procedurally barred because Smith had not sought to amend his initial Rule 3.850 motion although Pauldo had given her sworn post-trial statement over a month prior to the trial court's denial of Smith's initial motion. Thus, the trial court concluded that Pauldo's statement did not constitute newly discovered evidence. The trial court also found that there was no reasonable probability that the alleged new evidence would result in a different outcome in a retrial because "Ms. Pauldo's recantation would only detract from her credibility." We respectfully disagree with both of the trial court's conclusions. We find that Smith's second motion for post-conviction relief was not procedurally barred and that the trial court was required to hold an evidentiary hearing on such motion.
As a general rule, a defendant must file a motion for post-conviction relief in a non-capital case within two years of the date on which the judgment and sentence became final. Fla. R.Crim. P. 3.850(b). One exception to the two-year time bar is the discovery of new evidence where it is alleged that the facts on which the claim is predicated were unknown by the movant or the movant's attorney and could not have been ascertained by the exercise of due diligence. Fla. R.Crim. P. 3.850(b)(1). The Florida Supreme Court has held that a defendant must meet two requirements in order for a conviction to be set aside on the basis of newly discovered evidence. First, the evidence must have been unknown by the trial court, the party, or by counsel at the time of trial, and it must appear that the defendant or his counsel could not have known of it by the use of diligence. Second, the newly discovered evidence must be of such nature that it would probably produce an acquittal on new trial. Jones v. State, 709 So.2d 512, 521 (Fla.1998), cert. denied, Jones v. Florida, 523 U.S. 1040, 118 S.Ct. 1350, 140 L.Ed.2d 499 (1998).
Here, it is undisputed that Smith did not file his second motion for post-conviction relief within two years of the date on which his judgment and sentence became final. However, Smith's contention that the new evidence obtained from Pauldo was unknown at trial and could not have been ascertained with the exercise of *1205 due diligence is also undisputed. Instead, the State argues that Smith's post-conviction counsel should have amended the initial Rule 3.850 motion prior to the trial court's resolution of such motion. While we agree that would have been the better practice, the issue is whether Smith has abused the procedures set forth in Rule 3.850. Specifically, Rule 3.850(f) provides:
A second or successive motion may be dismissed if the judge finds that it fails to allege new or different grounds for relief and a prior determination was on the merits or, if new and different grounds are alleged, the judge finds that the failure of the movant or the attorney to assert their grounds in a prior motion constituted an abuse of the procedure governed by these rules.

(emphasis added). Under the unique facts of this case, we find that it was error to find that Smith's second motion was procedurally barred. Pauldo's statement was obtained on July 29, 2004, but was not transcribed and certified by the court reporter until September 2, 2004only days prior to the trial court's summary denial of Smith's initial motion. More importantly, Smith has alleged that his attorney, Michael Giordano, was supposed to bring this new evidence to the attention of the trial court but failed to do so. Indeed, in his second amended motion for post-conviction relief, Smith alleged that Giordano's whereabouts were still unknown. The fact that Giordano forfeited his license to practice law in the State of Florida less than a year after he took Pauldo's statement tends to support the conclusion that Smith's actions did not constitute "an abuse of the procedure governed by these rules."[3]
Ordinarily, an evidentiary hearing is required for the trial court to properly determine whether alleged newly discovered evidence is of "such a nature that it would probably produce an acquittal on retrial." Barrow v. State, 940 So.2d 1235, 1237 (Fla. 5th DCA 2006). In making this determination, the judge would necessarily have to evaluate the weight of both the newly discovered evidence and the evidence that was introduced at trial, so that the appellate court could fully evaluate the quality of the evidence which demonstrably meets the definition of newly discovered evidence. Id. Here, the trial court's order down-played the significance of Pauldo's new testimony. Pauldo's post-trial statement is not only a recantation of her identification of Smith as the shooter in a photo array and at a line-up, but it is also impeachment evidence as to the identification testimony of Lee Keith and Tommy Whitmer. § 90.608, Fla. Stat. (2008).[4] If the trier of fact was to accept Pauldo's testimony that Whitmer was not in the immediate vicinity of the fleeing suspect on the night of the shootings, the State's evidence regarding identification would be significantly weaker and it would seem *1206 unlikely, given all the other evidence in the case, that Smith would be convicted.
REVERSED and REMANDED for an Evidentiary Hearing.
PALMER, C.J. and PLEUS, J., concur.
NOTES
[1] Fla. R.Crim. P. 3.850.
[2] We commend the State for its thoroughness in reciting the evidence at trial in its response.
[3] We reject the State's suggestion that Smith should have filed a pro se motion to amend his pending motion for post-conviction relief when he was having difficulty communicating with his attorney. The time frame between Pauldo's sworn statement and the trial court's ruling was less than six weeks. If Smith had filed a pro se motion to amend his pending Rule 3.850 motion, it likely would have been considered a nullity. Logan v. State, 846 So.2d 472 (Fla.2003). We would further observe that even if Smith's second motion was deemed untimely, he would have been entitled to seek a writ of habeas corpus if the untimeliness resulted from his attorney's failure to seek to amend Smith's initial motion. Steele v. Kehoe, 747 So.2d 931 (Fla.1999).
[4] Our prior affirmance of the summary denial of Smith's initial Rule 3.850 motion should not be construed to prevent either party from being able to call Krystal Miles as a witness at a subsequent evidentiary hearing.