GRIFFIN, J.
 

 In 2000, Benjamin Smith [“Smith”] was found guilty of first degree murder, attempted first degree murder and attempted burglary of a vehicle. He was sentenced to life imprisonment for the murder, fifteen years for the attempted murder and three years for the burglary.
 
 [1]
 
 This Court per curiam affirmed his initial appeal.
 
 See Smith v. State,
 
 787 So.2d 874 (Fla. 5th DCA 2001).
 

 The events surrounding the trial and the trial testimony were set forth by this Court in a prior opinion:
 

 On February 3, 1996, at approximately 10:30 p.m., the victims, Ellis Tapley and Kenneth Dozier, and several of their friends and family members attended a monster truck rally at the Citrus Bowl in Orlando. As they were returning to their vehicles, one of the friends, Terry Manley, spotted a young black male trying to break into Dozier’s Ford Explorer. Manley ran ahead to the Explorer causing the would-be burglar to flee. Manley, Dozier, Tapley and another friend, Lee Keith, began to chase the suspect. During the chase, the suspect shot Tapley and Dozier. Tapley died at the scene, while Dozier was paralyzed from the chest down as a result of the shooting. A motorcycle police officer joined in the chase and exchanged gunshots with the fleeing suspect. However, the suspect was able to escape into a nearby neighborhood. The police officer was never close enough to the suspect to identify him.
 

 Ms. Pauldo was the only witness to the shooting of Tapley. She was parked at the side of the roadway to pick up her child who had been taken to the rally by a relative. She heard a commotion and, although it was dark, observed several men chasing a black male. She heard a gunshot and then saw the black male shoot Tapley. She testified at trial that she was able to see the suspect “squarely in the face” before he escaped....
 

 Smith v. State,
 
 990 So.2d 1199, 1200 (Fla. 5th DCA 2008).
 

 
 *823
 
 Two years after the trial, Ms. Pauldo learned that Smith was the nephew of one of her acquaintances, Rufus Shinn. Smith’s aunt informed Ms. Pauldo that Smith was innocent. Ms. Pauldo was later contacted by an attorney for Smith and, in 2004, she gave a sworn statement, which formed the basis for Smith’s 2006 motion for postconviction relief, based on “newly discovered evidence.” The motion asserted that “the sole witness to the incident, Mazie Pauldo [formerly known as Mazie Jackson], has recanted and substantially changed her 1996 and 1998 statements.”
 
 [2]
 
 In her statement attached to the rule 3.850 motion, Ms. Pauldo said that Smith was not the individual who shot Tapley and Dozier. She further averred that a police officer who had previously arrested her on drug charges threatened to have her put in jail if she did not cooperate by identifying the suspect. Additionally, Ms. Pauldo claimed that she was promised crime stopper reward money if she identified Smith. At trial, the defense had not been permitted to ask Ms. Pauldo whether she received, or expected to receive, reward money. Ms. Pauldo further averred that, at the photo line-up, Detective Gause showed her a picture of Smith and wanted her to identify him as the shooter. She said she gave in to the pressure and agreed that the person in the photograph was the shooter. Later on, immediately prior to the show-up, she claimed a detective again showed her a photograph of Smith and stated he did so “to keep [her] memory fresh.” In her sworn statement, Ms. Pauldo also alleged that she had been told not to tell anyone that she had been shown Smith’s photograph immediately prior to the line-up.
 

 Another important aspect of Ms. Paul-do’s sworn statement is her insistence that the ten-year-old boy, Tommy Whitmer, was not present at the scene. This testimony is significant because of Tommy Whitmer’s positive identification of Smith at the pre-trial line-up and at trial.
 

 The trial court initially denied Smith’s second 3.850 motion, finding that this additional ground for relief was known to Smith and his counsel prior to the trial court’s denial of his first rule 3.850 motion. The trial court additionally found that there was no reasonable probability that this recantation of Ms. Pauldo’s trial testimony would cause a different result upon retrial. Smith appealed that decision and this Court reversed and remanded the case for an evidentiary hearing. Specifically, this Court said:
 

 Here, the trial court’s order downplayed the significance of Pauldo’s new testimony. Pauldo’s post-trial statement is not only a recantation of her identification of Smith as the shooter in a photo array and at a line-up, but it is also impeachment evidence as to the identification testimony of Lee Keith and Tommy Whitmer. § 90.608, Fla. Stat. (2008). If the trier of fact was to accept Pauldo’s testimony that Whitmer was not in the immediate vicinity of the fleeing suspect on the night of the shootings, the State’s evidence regarding identification would be significantly weaker and it would seem unlikely, given all the other evidence in the case, that Smith would be convicted.
 

 Id.
 
 at 1205-06 (footnote omitted).
 

 At the rule 3.850 hearing, Ms. Pauldo’s testimony, in most respects, mirrored her sworn statement. Detective Gause testified at the evidentiary hearing and denied any misconduct and denied any knowledge that the show-up was tainted. The other
 
 *824
 
 detective assigned to help Detective Gause also testified and denied all of Ms. Pauldo’s allegations. The prosecutor testified that Ms. Pauldo was a cooperative witness, and he never threatened her with jail in order to make her testify.
 

 During closing arguments, the parties and the court discussed the issues before the lower court. The trial court made several statements, although it is unclear whether he intended them to be findings. The trial court observed that Ms. Pauldo’s testimony was not credible and that it was only Ms. Pauldo’s trial testimony that convicted Smith. The trial court expressed concern that the jury never learned that Ms. Pauldo received a $4,000 reward from Crime Stoppers because of her identification. The trial court observed that it was “not convinced that the trier of fact would have convicted [Smith] based on the lack of credibility had they known that testimony.” The trial court adverted to the statement in this Court’s prior opinion that “if the trier of fact were to accept her testimony that Whitmer was not in the immediate vicinity the State’s evidence regarding identification would be significantly weaker and it would seem unlikely given all the other evidence that Smith would have been convicted.” The court subsequently entered an order granting Smith a new trial.
 

 The appealed order is deficient in two respects. First, the order lacks any findings.
 
 Dillbeck v. State,
 
 882 So.2d 969, 972 (Fla.2004). Even if the statements made by the trial court could be characterized as findings supporting the order, they leave this Court unable to determine whether the order granting a new trial to Smith can be sustained on any basis. Also, the statements made by the trial court suggest that the decision was based on evidence received at the evidentiary hearing concerning Ms. Pauldo’s receipt of tip reward money.
 

 The fact that the jury never learned that Ms. Pauldo received reward money is not an adequate basis to award a new trial based on newly discovered evidence. The supreme court has said that, in order to prevail on newly discovered evidence, the defendant must establish that: (1) the evidence has been discovered since the former trial; (2) the evidence could not have been discovered earlier through the exercise of due diligence; (3) the evidence is material to the issue; (4) the evidence goes to the merits of the case and not merely impeachment of the character of the witness; (5) the evidence must not be merely cumulative; and (6) the evidence must be such that it would probably produce a different result on retrial.
 
 State v. Spaziano,
 
 692 So.2d 174, 176 (Fla.1997). Here, as the trial court observed, the issue of whether Ms. Pauldo received a reward would be, at most, impeachment material.
 

 Second, the trial court’s disallowance of testimony concerning the reward was not challenged on appeal. Smith’s trial counsel attempted to question Ms. Pauldo concerning any inducement she might have been given to testify, but the trial court sustained the State’s objection. Assuming that was error, it should have been raised on appeal.
 

 No findings were made by the trial court on Ms. Pauldo’s allegations of prosecutorial misconduct, except for the court’s observation that Ms. Pauldo was not credible. Given the trial court’s finding that Ms. Pauldo was not a credible witness, Ms. Pauldo’s allegations concerning prosecuto-rial and police misconduct carry little weight.
 

 Finally, there is the question of the recantation of Ms. Pauldo’s identification testimony at trial. For reasons unclear on our limited record, Ms. Pauldo apparently
 
 *825
 
 did not identify Smith in court; rather, her testimony focused on the photo line-up and the show-up identification. She confirmed at trial that she had identified Smith as the shooter from the photo line-up and again at the show-up identification. She was cross-examined about inconsistencies in her initial description of the assailant from the night of the shooting and Smith’s actual appearance. Ms. Pauldo claimed that the assailant had dark knuckles, was a young adult, no older than nineteen and was about 5'11 to 6 feet tall. During cross-examination, the following exchange concerning her observations took place:
 

 Q [N]ow, I’m going to ask you some question [sic] about identification of Mr. Smith. Mr. Smith, I’m going to ask you to rise, please. Would you hold your hands out, out front there? (Defendant complies) You said that the individual that did this had dark knuckles. Mr. Smith doesn’t have dark knuckles, does he?
 

 A No. I don’t see them now.
 

 Q You said you saw that that night because you honed in on that gun?
 

 A Yes, yes, It was right on the top.
 

 Q You can see Mr. Smith from where he’s standing right?
 

 A Yes.
 

 Q Is he taller than me?
 

 A He’s just a little.
 

 [[Image here]]
 

 Mr. Nesmith: I think the record reflects and Mr. Ashton said the defendant is roughly five feet seven.
 

 Q So he’s not six feet tall, is he?
 

 A No.
 

 Q Okay. May I? Ma’am, take a look at him. That’s not the man you saw that night, is it?
 

 A He looks a little different now. I mean he’s not dark and his [sic] has more hair.
 

 Q He’s not the man you saw, is it?
 

 A I don’t know. What you want me to say to that one?
 

 Q I want you to tell the truth.
 

 A It’s not the guy that — he doesn’t look the same from the picture or the line-up.
 

 Based on the foregoing, we reverse the new trial order, but, out of an abundance of caution, we remand to the trial court so that express findings can be made, if warranted, on the claim of prosecutorial and police misconduct, that would support the court’s prior decision to grant a new trial.
 

 REVERSED and REMANDED.
 

 TORPY and COHEN, JJ., concur.
 

 [1]
 

 . The fifteen-year sentence and three-year sentence were to be served concurrently with each other, but consecutive to his life sentence.
 

 [2]
 

 . Smith’s first 3.850 postconviction motion was per curiam affirmed by this Court.
 
 Smith v. State,
 
 894 So.2d 263 (Fla. 5th DCA 2005).